41100. INGRAM v. THE STATE.
(323 SE2d 801)

HILL, Chief Justice.

This is a death penalty case. Defendant Nicholas Lee Ingram was tried by a jury in Cobb County for murder, aggravated assault, and two counts of armed robbery ($60 and a pickup truck). He was convicted on all counts and sentenced to death for the murder. This is his appeal.[1]

---

[1] The jury returned its verdict as to sentence on November 21, 1983. A motion for new trial was filed December 20, 1983; heard on March 8, 1984; and denied March 30, 1984. The record was docketed in this court April 27, 1984. The case was orally argued September 17, 1984.

## *Facts*

At approximately 6:30 p.m. on June 3, 1983, a young white man armed with a pearl-handled pistol entered the home of J. C. and Mary Sawyer and demanded the use of their phone. This young man, whom Mrs. Sawyer later identified as the defendant, Nicholas Ingram, stated that he wanted money and the keys to their car. He fired a shot through the floor of the living room to prove that the gun was not a toy and threatened to blow their heads off if they did not comply with his demands. In response, Mrs. Sawyer gave Ingram $60 and J. C. gave him the keys to his blue-and-white Chevrolet pickup truck. Ingram then marched them outside and into the woods which surrounded their home. Using rope and some wire, Ingram tied his victims' hands behind them and then tied them to a tree. He told Mrs. Sawyer to remember a tattoo that she had noticed on his arm because it was going to get her killed. As the Sawyers begged for their lives, the defendant continued his threats, saying that he liked to torture people as he took off his shirt, tore it in two, and stuffed the two halves into their mouths. Then he shot them both in the head. J. C. Sawyer was killed; however, Mrs. Sawyer was only wounded. She fell to the ground and pretended she was dead until she heard the truck drive off. Realizing that her husband was dead, Mrs. Sawyer managed to untie herself and went to a neighbor's house to call the police.

Earlier that day, Ingram had gone to a pawn shop with his friend Kevin Plummer, in the latter's car, to sell some automobile wheels and a ring. Then they went to see a friend of Ingram's who worked at a convenience store. Afterwards, Ingram and Plummer drove to Ingram's father's house, where Ingram retrieved a pearl-handled .38 revolver. He told Plummer that he knew where he could get a vehicle that he was going to use to go to California. He directed Plummer to a driveway that led through the woods and up Blackjack Mountain in Cobb County. They drove a short distance up the driveway and stopped. Ingram got out and told Plummer to wait for him. He told Plummer that he might have to pistol-whip them but he was not sure he could shoot them. He walked up the driveway and out of sight. Plummer decided not to wait and drove home.

At around 8 p.m., Ingram showed up at the convenience store he had visited earlier that day. He remained only a few moments, then left, driving a blue-and-white pickup truck. The pickup truck was recovered on Interstate 20 in Mississippi three days later. Inside was a motel receipt from Lincoln, Alabama, dated June 3, 1983. The motel's portion of the receipt was later obtained and the handwriting on it was identified as Ingram's.

Ingram stole another car in California and was eventually arrested in Nebraska for DUI. While being questioned about the stolen

automobile, Ingram told the police that he could save them some time; that if they would check with Cobb County, Georgia, they would find that he was wanted for two murders. Questioning stopped then, and was resumed by Georgia authorities after they had been contacted and had returned Ingram to Georgia.

Ingram gave them a long statement in which he admitted remembering some of the events of the afternoon of June 3, including being dropped off at the Sawyer driveway, returning to find Plummer gone, getting into a truck and backing out of the driveway. He stated that he woke up the next morning in a shopping center parking lot in Alabama in the truck. He contended that he had blacked out from drinking and could not remember shooting or robbing anyone.

We have reviewed the evidence pursuant to Rule IV (B) (2) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq. It is sufficient to support the guilty verdicts. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

## Pre-trial Issues

1. Defendant's first seven enumerations of error stem from the trial court's denial of his pleas in abatement and challenges to the arrays of the grand and traverse juries.

(a) The foreman of the grand jury which returned the indictment in this case was Mack Henderson, a director of the Marietta Downtown Development Authority (hereafter, MDDA). In his first enumeration of error, defendant argues that Henderson's service on the grand jury rendered the indictment invalid under Ga. L. 1982, p. 779, OCGA § 15-12-60 (b) (1), which provides that "[a]ny person who holds any elective office in state or local government . . ." is incompetent to serve as a grand juror.

The MDDA was created by 1971 Ga. Laws 3459, as amended. Consistent with Section 2 of that statute, Mack Henderson was elected by a "caucus" of property owners, and defendant contends that Henderson therefore held an "elective office" within the meaning of OCGA § 15-12-60 (b) (1). We disagree.

"Elective" offices generally are taken to be "those which are filled by the direct exercise of the franchise of the voters." In re Opinion of the Justices, 139 A 180 (New Hamp. 1927). See also State ex rel. Smith v. Bowman, 170 SW 700, 701 (Missouri App. 1914); State ex rel. Duryee v. Howell, 110 P 543 (Wash 1910). We hold that the "elective office" referred to in OCGA § 15-12-60 (b) (1) is an office filled by citizens registered to vote and voting at an election. See 1983 Const., Art. II, Sec. I, Par. II; OCGA § 21-2-2 (25); OCGA § 21-3-2 (12); Op. Atty. Gen. 76-100. To rule otherwise would open the possibility that a person elected by grand jurors to serve as chairperson of the grand

jury pursuant to OCGA § 15-12-67 would be ineligible to serve on the grand jury (see Division 1 (c), below).

Henderson's selection by votes cast at a caucus of property owners was not an election by citizens registered to vote and voting at an election. Therefore, pretermitting whether Henderson holds an "office in state or local government" within the meaning of OCGA § 15-12-60 (b) (1), he does not hold an "elective office" within the purview of that code section and he was not incompetent to serve as a grand juror.

Defendant's 1st enumeration therefore is without merit.

(b) Another grand juror was an attorney who had filed no written request either for inclusion on the jury list or for exemption from jury duty.

At all relevant times during the proceedings below, two code sections made provision for exemptions from jury duty. OCGA § 15-12-1 (a) provided that attorneys were exempt from jury duty but that upon an attorney's written request, he could be included on the jury list. OCGA § 15-12-1.1 (a) provided that in "any county for which a plan for selection of jurors by electronic or mechanical means has been established pursuant to Code Section 15-12-42," the court could "by rule direct" that OCGA § 15-12-1.1 (b) would apply to jury exemptions. OCGA § 15-12-1.1 (b) provided that an attorney would remain on the jury list but could, upon written request, claim an exemption from jury duty.[2]

Defendant acknowledges that Cobb County utilizes a plan for selection of jurors pursuant to OCGA § 15-12-42 (b), but contends that since the superior court failed to expressly direct that the exemption provisions of OCGA § 15-12-1.1 (b) would apply, exemption procedure should have followed OCGA § 15-12-1 (a). Therefore, defendant argues, attorney Melodie Clayton should not have been included on the jury list absent a written request for inclusion, and her service on defendant's grand jury was reversible error. We disagree.

Under neither code section was Ms. Clayton disqualified. Instead, she enjoyed the privilege of claiming an exemption and the code sections differed only in the methods by which that privilege might be asserted. Regardless of which section applied, we find here no disregard of the substantive provisions of the law as would vitiate the array. Cf. *Franklin v. State*, 245 Ga. 141 (1) (263 SE2d 666) (1980). Moreover, the privilege of exemption belonged to the juror and does not provide defendant with grounds to object to her service on the grand jury. *Smith v. State*, 225 Ga. 328 (1) (168 SE2d 587) (1969).[3]

---

[2] OCGA § 15-12-1.1 has since been repealed and OCGA § 15-12-1 amended, to eliminate attorney exemptions from jury duty. Ga. Laws 1984, p. 1697.

[3] We note that Ms. Clayton testified that not only did she have no objection to jury

Thus, defendant's 2nd enumeration is without merit.

(c) In his 3rd enumeration, defendant alleges unconstitutional discrimination in the selection of grand jury forepersons.

Between January 1980 and October 1983, 23 grand juries were empaneled in Cobb County. Twenty-two of the forepersons were white men and one was a white woman. Consistent with the discretion given to judges of the superior courts by OCGA § 15-12-67, some of the forepersons were appointed by the court and others were elected by the members of the grand jury.

We note, first, that defendant does not contend that the grand jury list contains a significant underrepresentation of blacks or women, nor has he attempted to prove the composition of the grand jury list. Assuming, however, that the grand jury list contains the same percentages of blacks as does the traverse jury list (see below), then approximately one in 33 persons on the grand jury list is black. It follows that defendant's showing that none of the 23 grand jury forepersons was black fails in any event to demonstrate such an underrepresentation of blacks as would support a prima facie case of racial discrimination in the selection of grand jury forepersons.

Moreover, it is doubtful that he has shown sexual discrimination regarding foreperson selection in view of his failure to prove how many of the 23 forepersons had been appointed by a judge instead of elected by the grand jurors themselves. Compare *Spivey v. State*, 253 Ga. 187 (7b) (319 SE2d 420) (1984). We need not decide this, however, because we conclude that even if sexual discrimination entered into the selection of Cobb County forepersons, defendant is not entitled to a reversal of his conviction.

In Rose v. Mitchell, 443 U. S. 545, 551-552 (99 SC 2993, 61 LE2d 739) (1979), involving Tennessee grand jury foremen, the United States Supreme Court assumed, without deciding, that "discrimination with regard to the selection of only the [grand jury] foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." For a description of the Tennessee system, see *Spivey v. State*, supra. More recently the Court has held that discrimination in the selection of federal grand jury foremen "can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness" and therefore provides "no basis upon which to reverse [the] conviction or dismiss the indictment." Hobby v. United States, ___ U. S. ___ (35 Cr. L. R. 3185, 3187; Case No. 82-2140, decided July 2, 1984).

In Hobby, the Court noted that, in contrast to the Tennessee

---

duty, she desired to serve.

method of foreperson selection at issue in Rose v. Mitchell, in the federal system the foreman is selected by the judge from the membership of each grand jury and the office is strictly ministerial. The Court stated: "Given the . . . peculiar manner in which the Tennessee grand jury selection operated, and the authority granted to the one who served as foreman, the Court assumed in Rose that discrimination with regard to the foreman's selection would require the setting aside of a subsequent conviction . . . No such assumption is appropriate here, however . . ." Id. at 3188.[4]

As in the federal system, Georgia forepersons are selected from the membership of each grand jury and serve only with that grand jury. As in the federal system, a foreperson's duties are essentially ministerial. Thus, the assumptions of Rose v. Mitchell are inapplicable to the Cobb County foreperson selection system. Defendant's third enumeration is therefore without merit.

(d) In his 4th and 5th enumerations, defendant contends the Cobb County traverse jury list is improperly compiled and fails to represent a fair cross-section of the community.

In counties using a nonmechanical method to select jurors, OCGA § 15-12-40 (a) (1) provides that the board of jury commissioners "shall select a fairly representative cross section of the intelligent and upright citizens of the county from the official registered voters' list . . ." If, however, the jury list, so composed, "is not a fairly representative cross section of the intelligent and upright citizens of the county," the list must be supplemented. Id. In counties in which jurors are selected by mechanical or electronic means, the jury list may be taken from the registered voter list or from any other source approved by the jury commissioners. OCGA § 15-12-40 (b) (1). In either case, the voter list is an appropriate primary source from which jurors may be selected and must be supplemented only if the resulting list fails to meet constitutional requirements; i.e., fails to represent a fair cross-section of the community. See *Walraven v. State*, 250 Ga. 401 (3) (297 SE2d 278) (1982); *Devier v. State*, 250 Ga. 652 (300 SE2d 490) (1983).

Defendant contends that the Cobb traverse jury list was not properly compiled because the jury commissioners simply used the voter list without supplementing it and without realizing that non-

---

[4] Rose was also distinguished as a case raising an equal protection claim instead of the due process claim involved in Hobby. It is not at all clear to us that the remedy of reversal should be available in one context but not the other, but we note that since defendant here was not a member of the allegedly excluded class, he lacked standing to make an equal protection claim, thus leaving in this case, at best, the same due process claim raised in Hobby. Rose v. Mitchell, supra; Hobby v. United States, supra; Peters v. Kiff, 407 U. S. 493 (92 SC 2163, 33 LE2d 83) (1972).

voters could be included on the list.[5] The commissioners' reliance solely on the voter list, defendant contends, requires reversal of his conviction.

We disagree. In the absence of a showing that supplementation of the list was necessary to achieve a fair cross-section, we cannot ascribe reversible error to the failure of one or more of the commissioners to recognize that the list *could* be supplemented.

In 1983, there were in Cobb County 133,400 persons registered to vote and, hence, on the traverse jury list. Of this total the evidence established that 52.7% were female and that 2,538, or 1.9% of the total, could positively be identified as black.

Regarding the latter percentage, we note that only 62% of the voters were identifiable by race.[6] Thus, the 1.9% figure would accurately describe the black percentage of the voter list only if *all* of the voters not identified by race were white; put another way, the 1.9% figure would accurately describe the black percentage of the voter list only if we assume that *all* of the black voters were identified by race, even though only 62% of the total voters were identified by race. Such an assumption would be illogical. Therefore, absent evidence to the contrary, we assume that the black percentage of the racially-identifiable voters accurately reflects the black percentage of the voters as a whole; i.e., of the 82,399 voters identifiable by race, 3.1% are black.

Total county population, according to the 1980 official census, was 297,718. Of this number, 149,292, or 50.1%, were women. There was testimony that the non-white population was 16,023, or 5.4% of the total.

We judicially note that the term "non-white," as used in the census, includes a number of racial minorities. *In re Knight*, 232 Ga. 721 (2) (208 SE2d 820) (1974); 1980 Census of Population, General Population Characteristics (Georgia), Appendix B. The black population of Cobb County is actually 13,055, or 4.4% of the total. Id. Table 15.

The appropriate figures, then, for the percentages of blacks and women in Cobb County and on the jury list may be represented, in chart form, as follows:

---

[5] The grand jury list, initially selected electronically from the traverse list, was supplemented with names of persons recommended and approved by members of the board of jury commissioners. However, several of the commissioners testified that any names recommended which were not on the voter list would automatically be "kicked out" by the computer. Thus, every person on both lists was a registered voter.

[6] Prior to 1980, federal guidelines did not allow the identification of persons on the Cobb County voter list by race. As a result, only those persons placed on the list since 1980 are identified by race.

| | Population %<br>(1980) | Traverse Jury<br>List % | Absolute<br>Disparity |
|---|---|---|---|
| Blacks | 4.4 | 3.1 | 1.3% |
| Women | 50.1 | 52.7 | + 2.6% |

Clearly, insofar as blacks and women are concerned, no substantial disparity has been shown. Compare *Wilson v. State*, 250 Ga. 630 (3a) (300 SE2d 640) (1983).

However, defendant observes that in 1983, 222,914 residents were eligible to register to vote (and hence, were eligible for jury service) but that only 133,400 were actually registered to vote (and therefore on the jury list), and argues from these facts that 89,514 persons were "systematically excluded" from jury service. We disagree. There is no requirement that the jury list include the name of every citizen of the county eligible for jury service. The list must include a *fair cross-section* of the eligible members of the community, not every eligible member of the community.

Nor do we find any merit to defendant's contention that the underrepresentation of non-voters on the jury list provides a ground for challenge to the jury array, despite his assertion that blacks, young people, old people and poor people tend to be underrepresented on voter registration lists. Regarding blacks, the numbers (above) show no substantial disparity. As for the other categories, defendant has failed to demonstrate that such non-voters are a cognizable group for purposes of a jury challenge. See *Spivey v. State*, 253 Ga. 187 (7a), supra. Nor could he, since, insofar as persons eligible for jury service are concerned, the status of being a voter or a non-voter essentially may be changed at will. See Willis v. Zant, 720 F2d 1212, 1216 (11th Cir. 1983).

Defendant's 4th and 5th enumerations therefore are without merit.

(e) In enumeration 6, defendant complains of the manner by which people summoned for jury service are granted excusals or deferrals prior to trial. The procedure followed is similar to that described in *Franklin v. State*, 245 Ga. at 144-145, supra, except that excusals and deferrals are now handled by the court administrator.

In this case, of 180 persons to whom notices of potential jury service were sent, 52 were given excuses or deferrals, or were not summoned because the notices were returned by the post office as undeliverable. Persons with serious health problems, women with children under the age of 14, and persons no longer residing in Cobb County were excused. Other persons, for whom jury service at a particular time would present a hardship, were given deferrals to a subsequent term of court. Persons in the latter group included students, businessmen and people who had vacations planned.

Defendant argues that the range of excusals and deferrals authorized by local court rule, and granted by the court administrator, exceeded that authorized by law. See former OCGA § 15-12-1 (b) (Michie 1982). Therefore, defendant contends, his challenge to the array should have been granted.

These contentions are answered adversely to defendant by *Franklin v. State*, supra, 245 Ga. at 146-147. We note that defendant does not contend, and the evidence does not show, that the method utilized by Cobb County for granting excusals and deferrals has adversely affected the representative nature of the jury list by resulting in the substantial underrepresentation of cognizable groups on the jury venires actually present for trial. That is, there has been no showing of systematic underrepresentation. Compare Duren v. Missouri, 439 U. S. 357 (99 SC 664, 58 LE2d 579) (1979). Enumeration of error 6 therefore is without merit.

(f) The trial court did not err by refusing defendant's request for expert assistance to study the Cobb County voter registration list to determine if young, old and poor people were underrepresented. *Spivey v. State*, supra (9); *Wilson v. State*, supra (2c). Defendant's 7th enumeration is without merit.

2. Enumerations 8-12 and 21 allege error involving the jury voir dire.

(a) In enumeration 8, defendant contends the trial court erred by excusing four potential jurors for opposition to the death penalty. We find no error. It is clear from their testimony that none of these four jurors would vote for the death penalty no matter what the evidence. *Mincey v. State*, 251 Ga. 255 (8) (304 SE2d 882) (1983); *Allen v. State*, 248 Ga. 676 (2) (286 SE2d 3) (1982); Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

(b) The trial court did not err by refusing to grant defendant's challenge to a juror who had formed and expressed an opinion as to guilt or innocence, since the juror testified that she could lay aside that opinion and decide the case based upon the evidence presented and the law as charged by the court. *Spivey v. State*, supra (6d); *Waters v. State*, 248 Ga. 355 (2) (283 SE2d 238) (1981). Defendant's 9th enumeration is without merit.

(c) The trial court did not err by qualifying the jurors pursuant to Witherspoon v. Illinois, supra, or by denying defendant's request to try the issues of guilt and sentence by different juries. *Mincey v. State*, supra (2); Smith v. Balkcom, 660 F2d 573 (5th Cir. 1981). Enumeration 10 is without merit.

(d) Defendant has shown no error in the denial of sequestered voir dire. *Berryhill v. State*, 249 Ga. 442 (7) (291 SE2d 685) (1982); *Sanborn v. State*, 251 Ga. 169 (3) (304 SE2d 377) (1983). Enumeration 11 is without merit.

(e) In enumeration 12, defendant alleges error in the court's refusal to allow him to ask three questions regarding the death penalty on voir dire. We find no error. At trial, defendant agreed that the first of these three questions need not be asked, and the subject matter of the other two essentially was covered by other questions which were asked.

(f) Defendant asked potential jurors on voir dire whether they believed defendant would actually be executed if sentenced to death. The voir dire transcript shows that none of the jurors believed that an execution would be imminent and many expressed doubts that it would be carried out at all, in view of the infrequency of executions in recent years and the seemingly never-ending review of capital cases.

On the basis of these answers, defendant challenged the array at the close of voir dire, contending these jurors would be incapable of meaningful deliberation on the question of punishment and would be prone to impose the death penalty. He urges that he was entitled to a jury which believed the death penalty would be carried out. The denial of this challenge is the subject of defendant's 21st enumeration of error.

"[T]he fact that the death penalty has seldom actually been carried out in recent years is surely a matter of common knowledge," *Horton v. State*, 249 Ga. 871, 876 (7) (295 SE2d 281) (1982), and it is doubtful that any other venire would be any less familiar with the "seemingly interminable appeals process in capital cases," *Devier v. State*, supra, 250 Ga. at 654, or any more capable of fairly deciding the question of sentence. In any event, defendant's argument that he is entitled to a jury which believes the death penalty would actually be carried out (i.e., a jury free of the "Private Slovik Syndrome") has previously been rejected. *Horton v. State*, supra; *Gilreath v. State*, 247 Ga. 814 (5) (279 SE2d 650) (1981); see *Ross v. State*, 238 Ga. 445 (233 SE2d 381) (1977). Enumeration 21 therefore is without merit.

3. In his 27th enumeration, defendant contends the trial court erred by denying his motion to sever the murder charge. See OCGA § 16-1-7 (c). He urges that by trying the armed robbery charges with the murder charge, the state was able to introduce evidence of other armed robberies. As will be seen in Division 6, below, such evidence was admissible as to the murder charge. We find no error here. *Felker v. State*, 252 Ga. 351 (6) (314 SE2d 621) (1984); *Gober v. State*, 247 Ga. 652 (1) (278 SE2d 386) (1981).

## *Trial Issues*

4. After the jury was selected, but before opening statements were given, the trial court considered a motion in limine filed by the state which sought to suppress any defense mention of the fact that a

state's witness, Kevin Plummer, had been given a polygraph examination. Defendant's response was that although the results of the test would not be admissible, the fact that the state had requested the witness to take the test had some bearing on the credibility of the witness.

The court granted the motion in limine in a preliminary ruling and directed defendant not to refer to the test in his opening statement or during the examination of witnesses without prior approval of the court; at such time as defendant felt that he wanted to question a witness about the test, he was to ask for a recess and take the matter up with the court outside the presence of the jury. The court stated that if defendant could demonstrate a good reason to mention the test, he would then be granted that right by the court. Defendant never again mentioned the issue and, hence, the trial court never was called upon to rule on whether the defendant had laid a proper foundation for admitting testimony that a polygraph test had been requested by the state.

The conditional grant of a motion in limine in a preliminary ruling is not a final ruling on the admissibility of evidence. See *State v. Johnston*, 249 Ga. 413, 415 (3) (291 SE2d 543) (1982). Here there was no ruling actually excluding evidence as to the taking of the polygraph examination and defendant's 13th enumeration, in which he contends that the court's ruling denied him a thorough cross-examination of the state's witnesses, is therefore without merit.

5. No error occurred in the admission of photographs of the body of the murder victim, inasmuch as these photographs were taken prior to the autopsy. Compare *Ramey v. State*, 250 Ga. 455 (1) (298 SE2d 503) (1983); *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983). Defendant's 14th enumeration is without merit.

6. In enumeration 15, defendant complains of testimony regarding crimes he committed after he fled the scene of the crime on trial.

Two weeks after the Sawyers were robbed, defendant was in California as he had stated earlier to Plummer. He met a woman in a bar and they went to the beach in her car, Ingram driving. He told her he was Nick Jackson and was wanted for murder in Georgia. (This incriminating statement clearly was admissible.) Later they went to a motel. After they had been there an hour and a half, she noticed her purse was missing and called the police. Defendant told her he could not get involved with the police but that he was going to take her car and look for the thief. He never returned.

On June 22, defendant called his grandmother from Louisiana and asked her if his name had been in the news. She told him yes, that they were saying he had committed murder.

Defendant was next seen three days later in Colorado, where he and a companion picked up a hitchhiker. Defendant told the hitch-

hiker he should not have accepted a ride with strangers, and stated, "We're going to roll you." He added that he had already killed one man and could kill another. (This incriminating statement was also admissible.) They stopped on a dirt road under a bridge. Defendant made the hitchhiker remove his shirt. Then he cut up a towel using a knife he had taken from this victim, and used it to tie the man's hands behind him and to a bridge post. Defendant tore the man's shirt and gagged him with it. Then he struck him in the face three or four times. When a car stopped on the bridge above and asked what was going on, defendant told the car's occupants that they were having a party with some girls and the car drove off, only to return a short time later. By this time defendant and his companion had gone and the victim got a ride to a phone, where he called the police.

At approximately 11:00 p.m. on June 26, a Nebraska state trooper observed a car parked under a viaduct on Interstate 80. Its emergency flashers were on and the trooper stopped to render assistance. Defendant, still in the car he had taken from the woman in California, was slumped over the steering wheel and smelled strongly of alcohol. He was arrested for DUI. Inside the car was the knife he had taken from the victim in Colorado.

He was questioned the next day about the motor vehicle theft in California and the robbery in Colorado. Defendant again identified himself as Nick Jackson. He claimed to have borrowed the car and denied any knowledge of a hitchhiker being robbed in Colorado.

Defendant had left his driver's license in California. After checking with California authorities, Nebraska investigators again questioned defendant about his true identity. At this point defendant admitted his real name and stated, "I'll save you some trouble. If you call Cobb County, Georgia, I believe they have a couple of murder warrants out for me." (Again, this statement was admissible.)

Defendant contends that his character was improperly injected into the case by the foregoing testimony. We disagree.

Defendant was positively identified as the perpetrator of these subsequent crimes. During three incidents the defendant made incriminating statements. A person who, while committing a second crime, makes incriminating statements about an earlier crime cannot complain when evidence of the incriminating statements and second crime is admitted at the trial of the earlier crime. Moreover, the robbery in Colorado was similar in several ways to the Sawyer robbery (the non-stop threats and taunting, and the manner in which the victims' hands were tied and their mouths were gagged). That crime and the other events testified to were all part of a crime spree which began the afternoon of June 3 and culminated in defendant's arrest on June 26. The complained-of testimony was properly admitted to show incriminating statements, motive, plan or scheme, flight, and the cir-

cumstances of the arrest. See, e.g., *Walraven v. State*, 250 Ga. 401 (4b), supra at 628; *Barnes v. State*, 245 Ga. 609, 610 (266 SE2d 212) (1980); *State v. Luke*, 232 Ga. 815, 816 (209 SE2d 165) (1974).

7. In enumeration 16, defendant contends the introduction of photographs taken after his arrest, showing the tattoos on his body, violated his privilege against self-incrimination. We disagree. Requiring defendant to strip to his waist and be photographed neither compelled him to be a witness against himself within the meaning of the United States Constitution, Schmerber v. California, 384 U. S. 757, 760-65 (86 SC 1826, 16 LE2d 908) (1966), nor compelled him to "give testimony tending in any manner to be self-incriminating" within the meaning of Art. I, Sec. I, Par. XVI of the Georgia Constitution. *Raines v. White*, 248 Ga. 406 (284 SE2d 7) (1981).

8. In enumeration 19, defendant complains that the prosecutor's closing argument improperly commented upon his failure to testify. We find no error. A prosecutor may not comment on the failure of a defendant to testify, but he may "argue that evidence showing guilt has not been rebutted or contradicted," *Bryant v. State*, 146 Ga. App. 43 (1) (245 SE2d 333) (1978). Moreover, a prosecutor "[is] entitled to emphasize the evidence favorable to [the state], to discuss and draw inferences from factual matters in evidence relating to the credibility of witnesses, and to respond to points made in — and issues omitted from — the defendant's closing argument." *Spivey v. State*, supra, 253 Ga. at 189. No more than that occurred here.

9. The court's instructions on malice, see OCGA § 16-5-1 (b), and flight were not burden-shifting. *Franklin v. State*, supra, 245 Ga. 141 (9); *Pollard v. State*, 249 Ga. 21 (3) (287 SE2d 189) (1982). Defendant's 25th enumeration is without merit.

10. In enumeration 20, defendant contends the prosecutor improperly encouraged the imposition of the death penalty on the basis of a comparison between defendant's character and that of the victim. We disagree.

"The identity and general background of the victim are relevant issues in a trial of one accused of his murder . . ." *Stevens v. State*, 247 Ga. 698, 703 (278 SE2d 398) (1981). It is not constitutionally impermissible "for the jury to know who it was that was the victim of murder." Moore v. Zant, 722 F2d 640, 646 (11th Cir. 1983).

Of course, a jury may not base its sentence on such constitutionally impermissible factors as race, religion, class or wealth. *Horton v. State*, supra, 249 Ga. at 874. "The prosecution . . . cannot make the existence of such an identifiable characteristic of either the defendant or the victim an issue per se and justification for a death sentence." Moore v. Zant, supra. We find that no such attempt was made here and that neither the evidence nor the argument exceeded constitutionally permissible bounds in this regard.

11. The trial court did not err by refusing to allow defendant to offer testimony describing the mechanics of an electrocution. *Horton v. State*, supra (5). Defendant's 17th enumeration is without merit.

12. In his closing argument at the sentencing phase, the prosecutor argued: "People cry and they say rehabilitation, rehabilitation, he can be rehabilitated and when he gets out, he'll be a better person for it." Later he contended, "[H]e's a walking timebomb, and he's walked before and he's exploded before, with unbelievable violence, unbelievable violence, and lashed out at people who'd never done anything to him before, never said the first cross word."

Defendant did not timely object to these portions of the state's closing argument. However, he now contends, in his 18th enumeration of error, that these arguments were improper. Because this is a death penalty case, we have reviewed the prosecutor's closing arguments and we do not find them to be so prejudicial or offensive, or to involve such egregious misconduct on the part of the prosecutor, as to require reversal of the death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor. *Spivey v. State*, supra, 253 Ga. at 191.

13. The trial court supplied the jury with two verdict forms as to sentence. One recited, "We find the following statutory aggravating circumstances," included a space to list same, and ended with a recommendation of the death penalty. The other form was simply a recommendation of life imprisonment.

In his 22nd enumeration, defendant alleges error in the court's failure to supply the jury with a verdict form stating that the jury found statutory aggravating circumstances but nonetheless recommended life imprisonment.

We find no error. The court's instructions clearly, explicitly, and repeatedly reminded the jury that it could recommend a life sentence even if it found one or more statutory aggravating circumstances beyond a reasonable doubt. See *Fleming v. State*, 240 Ga. 142 (7) (240 SE2d 37) (1977); *Hawes v. State*, 240 Ga. 327 (9) (240 SE2d 833) (1977).

Except in cases of treason or aircraft hijacking, a verdict recommending a death sentence is not valid absent a finding of statutory aggravating circumstances. OCGA § 17-10-30 (c). No such findings need be disclosed on a verdict recommending mercy. The forms supplied were sufficient and this enumeration is without merit.

14. Prior to trial, defendant obtained funds to secure an independent psychological evaluation. The state responded with its own request for an evaluation, which was also granted.

At the sentencing phase of the trial, defendant offered the testimony of his psychologist in mitigation. After the defense rested, the state offered for the first time, in rebuttal, the testimony of the two

experts who had conducted the state's evaluation of defendant.

At trial, defendant's only contemporaneous objection to the testimony of the state's experts was that it should have been offered during the state's case-in-chief and that it was not proper rebuttal testimony. After the evidence had closed, arguments had been made, and the jury had been charged, defendant renewed his objection, adding a fifth amendment ground to his objection to the testimony.

On appeal, he contends in his 23rd enumeration that the state's expert psychological testimony violated his fifth amendment privilege against self-incrimination inasmuch as there was no evidence that he was given the warnings required by Estelle v. Smith, 451 U. S. 454 (101 SC 1866, 68 LE2d 359) (1981), and Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

The use of a compelled psychological evaluation to establish a basis for the imposition of punishment clearly implicates fifth amendment rights. Estelle v. Smith, supra. However, we note that a number of courts have allowed the prosecution to offer otherwise inadmissible psychiatric testimony in rebuttal of psychiatric testimony offered in the first instance by the defense. See, e.g., Battie v. Estelle, 655 F2d 692, 701-02 (5th Cir. 1981) and cases cited at fn. 22. In Battie, the Court stated: "In this situation, this Court [in United States v. Cohen, 530 F2d 43 (5th Cir.)] held that the introduction by the defense of psychiatric testimony constituted a waiver of the defendant's fifth amendment privilege in the same manner as would the defendant's election to testify at trial. Cohen, like virtually every other federal and state court addressing this issue, concluded that any burden imposed on the defense by this result is justified by the State's overwhelming difficulty in responding to the defense psychiatric testimony without its own psychiatric examination of the accused and by the need to prevent fraudulent mental defenses."

In this case, the trial court made no determination whether defendant had been advised of his Miranda rights in connection with the state's psychological evaluations, nor did the court make any findings regarding a possible defense waiver by its introduction of expert psychological testimony, for a very simple reason: No timely fifth amendment objection was raised. Thus, we find no fifth amendment error. See Hudson v. State, 250 Ga. 479 (6) (299 SE2d 531) (1983); see also Harrell v. State, 249 Ga. 48, 52 (288 SE2d 192) (1982).

Defendant's original objection, that the state's testimony was improper rebuttal, is without merit.

There remains only the question whether this testimony resulted in a death sentence improperly influenced by passion, prejudice, or other improper factor. Mincey v. State, supra, 251 Ga. at 272. We find that the admission of relevant evidence bearing on defendant's mental condition had no such impermissible effect.

15. During the sentencing phase of the trial the court told the jury: "Whatever your verdict is, it must be unanimous, that is, agreed to by all twelve of you." Defendant's 24th enumeration, in which he contends that this charge was error, is without merit. *Allen v. State*, 253 Ga. 390 (2) (321 SE2d 710) (1984).

16. The court did not err by refusing to instruct the jury that if it imposed a life sentence for the murder it could specify whether that sentence would run consecutive to or concurrent with the sentences to be imposed for the other crimes involved in this case. *Spivey v. State*, supra (5). Enumeration 28 is without merit.

17. During the sentencing deliberations, a juror asked permission to make a business phone call. The juror was brought to the judge's chambers and the call was made in the presence of the judge, the court reporter, a bailiff, and attorneys for both sides.

The juror apologized for making "a big thing out of it," and the court responded: "It's not a big thing, but it's just that the jury is not — In a death case you see, in ten years, maybe somebody will say something about it."

After the juror returned to the jury, defendant moved for a mistrial or, in the alternative, the replacement of this juror by an alternate. In his 26th enumeration, defendant contends the court's denial of this motion was reversible error.

The court's comment was unnecessary, and better left unsaid. However, we cannot agree with defendant's contention that it amounted to an expression of opinion that the death penalty should be imposed in this case, or that the oblique reference to some sort of future appeal encouraged the juror to give diminished importance to the task of deciding the issue of sentence on the evidence presented by impermissibly suggesting that the jury's evidentiary findings could be set aside by a higher court if unwarranted. Compare *Prevatte v. State*, 233 Ga. 929 (6) (214 SE2d 365) (1975).

### Review Under The Unified Appeal Procedure

18. Under the Georgia Unified Appeal Procedure, this court reviews the entire record of the case to review each assertion of error timely raised by the defendant during the proceedings in the trial court whether or not error is enumerated and argued in the Supreme Court. Rule IV (B) (2) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq. Defendant includes in his brief a "non exhaustive list" of 16 issues not specifically enumerated as error. We address two.

(a) The statement that defendant gave to Cobb County law enforcement officers after his return to Georgia was tape-recorded and this tape was played to the jury. Defendant mentioned having previously been in jail and being on probation, in connection with his ex-

planation that the reason he could not remember everything that happened at the Sawyer residence was an alcohol-related blackout of the sort that had given him problems for years. He would drink, black out, do bad things, and wake up the next morning with no memories of what he had done.

Defendant contends that the admission of his taped statement erroneously placed his character in evidence. We disagree. " 'It is no valid ground of objection to the admission in evidence of an incriminatory statement or confession made by the accused in a criminal case that the language indicated that the accused had committed also another and separate offense. [Cits.]' *Reed v. State*, 197 Ga. 418 (6) (29 SE2d 505)." *Ledford v. State*, 215 Ga. 799, 805 (6) (113 SE2d 628) (1960).

(b) In order to identify the handwriting on the Alabama motel receipt as defendant's, the state procured three letters written by defendant from prison. These handwriting samples allowed the state's expert to make a positive identification of the writing on the motel receipt.

In response to defendant's objection to these exemplars on the ground that they improperly injected his character into the case, the state cut off the top portions of these letters which indicated that they had been written on prison stationery. There remained in these letters references which, defendant contended, "could be interpreted by the jury to be past criminal conduct."

The state noted that under decisions of the Georgia Court of Appeals, a defendant may not be compelled to give a handwriting exemplar. See, e.g., *State v. Armstead*, 152 Ga. App. 56 (262 SE2d 233) (1979). The only other handwriting sample available to the state was a handwritten confession to a burglary. Thus, the state contended, the least objectionable samples available to it were the letters. These letters, the state argued, were necessary to establish that the handwriting on the motel receipt was defendant's, which fact, once established, would confirm that defendant had J. C. Sawyer's truck after the murder. In view of defendant's allegation that Mrs. Sawyer had mistakenly identified him, this evidence was corroboration of her testimony.

Under these circumstances, the court did not err by allowing the admission of the letters. Compare *Hyde v. State*, 196 Ga. 475 (5) (26 SE2d 744) (1943); *Watkins v. State*, 151 Ga. App. 510 (2) (260 SE2d 547) (1979).

(c) We find no other addressable allegations of error not enumerated and argued by defendant.

## Sentence Review

19. The jury found as a statutory aggravating circumstance that: "The offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit: Armed Robbery." See OCGA § 17-10-30 (b) (2). The evidence supports this finding beyond a reasonable doubt. OCGA § 17-10-35 (c) (2); Jackson v. Virginia, supra.

20. We find that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

21. We further find that the sentence of death is not excessive or disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). Our cases show that juries find the death penalty to be appropriate punishment where a defendant commits murder during an armed robbery.

Defendant forced his way into the victims' home, robbed an innocent couple, unknown to him, and then attempted to eliminate them as witnesses by shooting each of them in the head. See *Rivers v. State*, 250 Ga. 288, 302 (298 SE2d 10) (1982). Here, as in *Mincey v. State*, supra, defendant "intended to kill both victims and only by chance did one survive." Id. 251 Ga. at 275.

The cases listed in the appendix support the death penalty in this case.

*Judgment affirmed. All the Justices concur, except Smith, J., not participating.*

DECIDED NOVEMBER 27, 1984 —
REHEARING DENIED DECEMBER 12, 1984.

*Dennis C. O'Brien, William L. McCulley,* for appellant.
*Thomas J. Charron, District Attorney, James F. Morris, Debra H. Bernes, Fonda C. Saxon, Assistant District Attorneys, Michael J. Bowers, Attorney General, J. Michael Davis,* for appellee.

### APPENDIX.

*Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State*, 236 Ga. 460 (224

SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975).