## 44110. HOUSEL v. THE STATE.
(355 SE2d 651)

CLARKE, Presiding Justice.

This is a death penalty case. Appellant, Tracy Lee Housel, was indicted in Gwinnett County on charges of murder, rape, motor vehicle theft and three counts of financial-transaction-card theft. After a jury was selected, Housel pled guilty to murder and motor vehicle theft. The state did not pursue the remaining charges, but continued to seek the death penalty on the murder count. A jury trial was conducted on the question of sentence, and Housel was sentenced to death. He now appeals.[1]

### Facts

Evidence was presented at the sentencing trial that, during a two-month period in early 1985, Housel killed a man in Texas, stabbed a man in Iowa, sodomized a woman in New Jersey, and, finally, killed the woman in Gwinnett County, Georgia, for whose murder the defendant received the death sentence in this case. Housel's pre-trial statements concerning these crimes were admitted in evidence. In addition, the surviving Iowa and New Jersey victims testified, as did law enforcement officers from Texas, Florida and Georgia.

Housel left his wife in California in October of 1984, his marriage having unraveled as a result of his "being on the road" all the time. A month later Housel began living with a woman in Council Bluffs, Iowa. In February 1985, Housel was at a truck stop in Spring, Texas, "laid over trying to get a load." Housel stated, "We were all in our leathers, dressed more or less like a rowdy little bike club, just raising Hell and discontent." He met a man named Troy, who had a quantity

---

[1] The crime occurred April 7, 1985. The defendant was indicted on June 4, 1985. The jury selection began January 28, 1986, and the jury reached its verdict on February 7, 1986. A motion for new trial was filed March 10, 1985. An amendment thereto was filed July 22. The motion was heard on August 1 and September 26, 1986, and was denied on the latter date. The case was docketed in this court on November 25, 1986, and was orally argued February 9, 1987.

of cocaine and was trying to sell it. Troy got drunk, and Housel helped him out to his truck and went back to the bar. He learned (he said) that "a couple of guys [were] planning on robbing [Troy] of all of his cocaine," but after he told them not to, they "left him alone." However, Housel himself "was wanting, I guess, a little bit more cocaine," so he climbed into Troy's cab "just [to] fix my nose again and go on about my business." Troy woke up and accused Housel of trying to steal his cocaine. When Troy grabbed him by the throat, Housel picked up a hammer and hit him on the head eight or nine times.

Housel took Troy's cocaine and a few other things, including a CB radio, a stereo, and Troy's identification, put them into his bag, and drove the truck to Beaumont, Texas, where he left it. He stated that Troy was still breathing when he left Spring, but that he died somewhere between Spring and Beaumont.

Troy's body was found in the sleeper of his cab, seven miles from Beaumont, Texas, on February 20, 1985. He was nude from the waist down, and had been anally sodomized.

On March 29, 1985, Housel was back in Council Bluffs, Iowa. He met a man named Gary at a truck stop and asked him for a ride to Des Moines, where perhaps he could get a job. Gary told him he would take him as far as Atlantic, which was about halfway. They got into Gary's car and drove. Gary testified that when they reached the Atlantic exit, Housel pulled out a knife and told him to drive on. A couple of exits later, Housel told Gary to pull off the interstate and park. Then, Gary testified, Housel demanded his wallet, and stabbed him as he reached for it.

Housel stated that Gary made a gesture which he interpreted as a homosexual advance, and he "freaked"; he pulled out his knife and began stabbing him. Gary denied making any sexual advances.

In any event, Gary got out of his car, and Housel pushed him down a ravine. When Gary climbed out, Housel stabbed him several more times and threw him back in.

Gary had thrown away his keys, but Housel found a spare key in the console and drove the car to New Jersey. Credit card receipts found in Housel's belongings after he was arrested showed that he had used Gary's credit cards in Iowa, Illinois and Pennsylvania on March 30 and April 1.

On April 2, 1985, a young woman named Renee met Housel at the apartment of a friend of hers in Phillipsburg, New Jersey. Housel introduced himself as "Troy." About 11:30 p.m., Renee announced that she was going home. "Troy" (who Renee identified at trial as the defendant) offered to escort her to her car. Once there, Housel entered the car and began to strangle her, and then forced her to orally sodomize him. Telling her she was too nice to kill, he took all her money and left. Renee testified that she had marks on her neck from

being strangled that did not finally disappear until late that summer.

Next, Housel drove Gary's car to Spartanburg, South Carolina, where he abandoned it. He caught a ride from there to Lawrenceville, Georgia.

After "drinking all night," Housel met the victim in this case, Jean Drew, in the early morning hours of April 7, 1985, at a Lawrenceville truck stop. Housel said they had sex, and then went for a ride in her car, a silver-gray Mustang. They parked in an open area behind some woods, just off Beaver Ruin road in Gwinnett County. According to Housel, they were having sex again in the back seat of her car when he got the urge to spit. Unfortunately, his spit hit her window. She began yelling at him, and he lost his temper and began striking her with his fists. (There was blood all over the inside of the car when it was recovered.) They got out of the car. Her nose was bleeding, and she spit blood on him. Then he really hit her, and she fell "like a ton of bricks." He got on his knees and strangled her, and then he picked up a stick and beat her face to a "bloody pulp."

Housel left her lying there, and drove her car to Daytona Beach, Florida, where, using her credit cards, he stayed several days prior to being arrested.

Jean Drew's body was found later that morning, nude from the waist down. Her head was "extensively traumatized and disfigured." There were "several lesions about the neck area," and there was "blood smeared on both hands."

The pathologist who conducted the autopsy testified that the victim was still alive at the time of strangulation, and that the "[strangulation] force was fairly long in duration given the amount of . . . contusion in the area of the neck . . .; the [hyoid] bone . . . was broken . . . and there was digging of fingernails not just into the skin and left in place, but actually tearing through the skin which is another indication of a fair degree of struggle on the part of the decedent."

Several of the victim's teeth had been knocked out. Her mouth was cut. Her skull was crushed in three places. The pathologist testified that because of the extensive trauma to the head, it was impossible to determine how many times the victim had been struck.

Cause of death was "a combination of multiple head trauma and asphyxiation by strangulation."

### Enumerations of Error

1. In his first enumeration of error, Housel contends that the confession he gave to Gwinnett County Detective Latty about the Texas murder should have been excluded. He claims that "he was denied his constitutional right to the assistance of counsel as judicial proceed-

ings had been commenced and Detective Latty's 'helpful hints' on the initiation of the conversation were tantamount to interrogation." Appellant's brief, p. 9.

Housel was arrested in Daytona Beach, Florida, on April 14, 1985. He was interrogated by law officers there about the Georgia case involving Jean Drew and also about the assault in Iowa. On April 18, 1985, he was returned to Gwinnett County, Georgia. Thereafter, attorney Walt Britt was appointed to represent Housel.

Housel was returned to Georgia by Gwinnett County investigators Latty and Mitchell. Detective Latty testified that on the trip back, the two talked with the defendant, but not about any crimes. After his return, the defendant called Latty on several occasions. These conversations, testified Latty, "consisted mostly of what was going on at the jail and trying to locate members of his family and that type of thing."

Latty testified that he explained to Housel "that I could not initiate an interview with him about this crime or other crimes because of the fact that he had a court-appointed attorney and so forth. I explained to him that if we discussed any crimes that it would have to be, that he would have to initiate the interview, and he agreed to that or said he understood that."

About two weeks after Housel was arrested, Gwinnett law officers received NCIC teletype information from Orange County, Texas, concerning a homicide that had occurred there in February. The communication included a detailed description of the suspected killer. The Gwinnett authorities suspected he might be Housel and contacted the Orange County investigators. They discovered that the Texas victim's name was the same as that found on identification carried by Housel when he was arrested. Soon afterwards, two Texas investigators visited the Gwinnett County Jail to confer with the Gwinnett investigators and to look at Housel. They did not question him.

On May 1, 1985, Latty called the defendant's attorney. Latty informed the attorney that Texas law officers were investigating a homicide in which the defendant was a suspect and needed photographs of him — especially of a tattoo on his left arm — and fingerprints. The attorney objected to the defendant being photographed or fingerprinted. In addition, the attorney told Latty, "I did not want anybody from out of state talking to him unless I was there."

Housel saw the Texas investigators when they came by and later asked Latty who they were. Latty told him they were from Orange County, Texas.

On May 10, Housel telephoned Latty and told him he wanted to talk about a Texas murder case. Latty attempted to call Housel's attorney. The attorney was out, but his wife told Latty she would give him the message.

Latty testified: "I met with [Housel]. I explained to him that due to the fact that he had magazine [sic] appointed counsel that I could not initiate an interview with him, that he had that protection. I explained to him that in order for me to talk to him about this case or any other case that he would have to initiate the interview. And he said he understood that and that's what he want[ed] to do."

Latty testified that he discussed with Housel his attorney's desire that Housel not talk to anybody in the attorney's absence, and that Housel responded that his attorney "was a little sawed-off son of a bitch" that "didn't spend much time with him" and "wasn't representing him like he ought to be," and that he "didn't want his attorney present," and "wanted to tell us about the case."

The interrogation was tape-recorded. The transcript of the tape begins as follows:

"By Investigator Latty:

"Q Tracy, to begin here, I have previously advised you of your rights. But for the purpose of this tape, I'm going to advise you again so that we'll have that recorded also. And those rights are as follows:

"You have the right to remain silent; do you understand that?

"A Yes, sir, I do.

"Q Anything you say can be used against you in court; do you understand that?

"A Yes, sir.

"Q You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning; do you understand that?

"A Yes, sir, I do.

"Q If you can't afford a lawyer, one will be appointed for you before any questioning if you wish; do you understand that?

"A Yes, I do.

"Q It should be noted at this point that Tracy has a court-appointed attorney, Walt Britt, but you have waived having him here at that [sic] time, Tracy; is that correct?

"A Yes, it is.

"Q If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer, do you understand that?

"A Yes, I do?"

The interview then proceeded, and the tape ended with this inquiry:

"Q Tracy, one more time to finalize this thing. Whose idea was this conversation?

"A Mine. I called you from Gwinnett County Jail tonight to see if you could come over and talk to me."

(a) Housel's claim here is apparently grounded in the Sixth Amendment. Although the parties have not focused clearly — here or below — on the question of when adversary judicial proceedings commenced or, therefore, at what point the defendant's Sixth Amendment right to counsel in this case attached, the record does show that Housel was brought before a Gwinnett County magistrate on April 26, 1985. Although the precise nature and character of this proceeding is not clear, it appears from the magistrate's order that Detective Latty was a witness, presumably for the state. We therefore will assume that this hearing triggered Housel's Sixth Amendment right to counsel. Compare *Ross v. State*, 254 Ga. 22 (3b) (326 SE2d 194) (1985).

(b) Neither of the parties has squarely addressed the extent to which the attachment of the defendant's Sixth Amendment right to counsel with respect to the crimes charged in Gwinnett County might affect the admissibility of a confession to a crime committed in Texas, as to which, insofar as this record shows, Housel's Sixth Amendment right to counsel had not attached.

"The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes . . . In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused . . . On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges . . . if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel . . . Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Maine v. Moulton*, 474 U. S. ___ (106 SC 477, 489, 490 n. 16, 88 LE2d 481) (1985).

Here, the incriminating statements pertain to other crimes, as to which the Sixth Amendment right had not attached when the statements were elicited. However, the question here is not their admissibility in a trial in Texas, but in a trial in Gwinnett County, on charges as to which the defendant's Sixth Amendment right to counsel *had* attached. Moreover, in the circumstances of this case, the interrogating officers could well have anticipated that incriminating statements concerning the Texas crime would be useful in the prosecution of the Gwinnett crime (even though the state did not formally announce an intention to seek a death sentence until July 23, 1985).

Therefore, we assume that the strictures of the Sixth Amendment apply equally in this case to incriminating statements pertaining to crimes committed in Gwinnett County and to extrinsic crimes used in aggravation of sentence.

(c) Finally, there is no direct evidence in this case that Housel ever "asked for the help of a lawyer." *Michigan v. Jackson*, 475 U. S. ___ (106 SC 1404, 1408, 89 LE2d 631) (1986). However, since an attorney was appointed to represent him, we shall assume that Housel invoked his right thereto (that is, that he got one because he asked for one).

(d) Now, we may reach the merits of Housel's claim.

A Sixth Amendment right to counsel, like a Fifth Amendment right to counsel, may be waived by the accused. See *Moran v. Burbine*, 475 U. S. ___ (106 SC 1135, 1145, 89 LE2d 410) (1986). ("It is clear, of course, that, *absent a valid waiver*, the defendant has a right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." (Emphasis supplied.))

It has been suggested that the Sixth Amendment waiver standard is stricter than that of the Fifth Amendment. See, e.g., *Ross v. State*, supra at 26 (cases cited in fn. 2). The U. S. Supreme Court has never held that to be the case, however.[2] Moreover, the Court's recent application of the bright-line rule of *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981) to a Sixth Amendment case is persuasive evidence that the waiver standards of the Fifth and Sixth Amendments are essentially the same. *Michigan v. Jackson*, supra.

In either case, once a defendant requests an attorney, all police-initiated interrogation is prohibited, and any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.[3] However, the defendant himself may initiate further communications with the police.

(e) We do not agree that Detective Latty's "helpful hints" on his inability to initiate a discussion about any crimes were the functional equivalent of an interrogation. See *Rhode Island v. Innis*, 446 U. S.

---

[2] And it has been pointed out that *Brewer v. Williams*, 430 U. S. 387 (97 SC 1232, 51 LE2d 424) (1977), which the U. S. Supreme Court chose to treat as a Sixth Amendment case, quotes extensively and approvingly the discussion of waiver by the lower federal courts, without, however, pointing out that the lower courts had discussed waiver in a Fifth Amendment context. See Kamisar, *Brewer v. Williams, Massiah and Miranda: What is Interrogation? When Does it Matter?* 67 Geo. L. J. 1, 30-33.

[3] The events triggering the attachment of a right to counsel under the Fifth Amendment differ from those which trigger the attachment under the Sixth Amendment. See *Ross v. State*, supra at 26-27 (fn. 3). What we hold today is that, once attached, either right may be waived in an essentially identical manner, and subject to the same limitations.

291 (100 SC 1682, 64 LE2d 297) (1980). Latty's warning to a defendant who had called him on several occasions to ask for information and assistance that he could not initiate any discussion with the defendant about any crimes can hardly have been reasonably calculated to elicit incriminating admissions of criminal activity.

In this case, knowing that his attorney did not want him to talk to the police, and knowing that the police could not talk to him unless he initiated the conversation, Housel telephoned Detective Latty and told him he wanted to talk about a Texas murder. Then, after listening to Detective Latty's careful explanation of his rights, including his right not to talk and to consult his attorney prior to any questioning, Housel chose to talk. We find that he validly waived his Sixth Amendment right to counsel.

The trial court did not err by failing to exclude the statement.

2. Housel's second enumeration of error is answered by Division (5 d) of *Ross v. State,* supra.

3. The failure to give a requested instruction is not reversible error where the charge given substantially covers the same principle of law. *Fox v. State,* 238 Ga. 387 (2) (233 SE2d 341) (1977). Enumeration 3 is without merit.

### Sentence Review

4. The jury found the existence of the § b (7) statutory aggravating circumstance and recommended a death sentence.[4] See OCGA § 17-10-30 (b) (7). The evidence supports this finding. Compare *Hance v. State,* 254 Ga. 575 (6) (332 SE2d 287) (1985).

5. We do not find that the sentence of death was imposed in this case as the result of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1).

6. Housel's sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 19, 1987 —
RECONSIDERATION DENIED JUNE 3, 1987.

---

[4] The form of the verdict did not fully set forth the statutory language of the first component of the § b (7) circumstance, see *Hance v. State,* 245 Ga. 856, 860 (268 SE2d 339) (1980); however, both parties had an opportunity to look at the verdict and agreed that it was in proper form (unlike an earlier version, which omitted any reference to the first component of § b (7)). We find the jury's intent sufficiently clear in this case that we may rationally review the finding. Compare *Page v. State,* 256 Ga. 191 (7) (345 SE2d 600) (1986).

*Pruitt & Britt, Walter M. Britt,* for appellant.

*Thomas C. Lawler III, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Assistant Attorney General,* for appellee.

APPENDIX.

*Hance v. State,* 254 Ga. 575 (332 SE2d 287) (1985); *Allen v. State,* 253 Ga. 390 (321 SE2d 710) (1984); *Finney v. State,* 253 Ga. 346 (320 SE2d 147) (1984); *Conner v. State,* 251 Ga. 113 (303 SE2d 266) (1983); *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Mathis v. State,* 249 Ga. 454 (291 SE2d 489) (1982); *Smith v. State,* 249 Ga. 228 (290 SE2d 43) (1982); *Cunningham v. State,* 248 Ga. 558 (284 SE2d 390) (1981); *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977).