S89A0142. STRICKLAND v. THE STATE.
(389 SE2d 230)

PER CURIAM.

Robert Strickland shot and killed his wife, Yvonne Strickland, with a handgun. He was convicted of murder and sentenced to life imprisonment.[1]

Strickland's first conviction was reversed in *Strickland v. State,* 257 Ga. 230 (357 SE2d 85) (1987), and the evidence presented at the first trial, except some additional material contained in the Jackson-Denno hearing, was substantially the same as the evidence at the second trial.

1. The evidence is sufficient to permit a rational trier of fact to find Strickland guilty of murder beyond a reasonable doubt of the malice murder of his wife. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The principal issue of this appeal is whether the trial court erred in allowing the jury to consider certain physical and testimonial evidence obtained as a result of illegal custodial interrogations.[2] The State concedes that the police conduct was improper, and that the trial court correctly suppressed Strickland's statements made *after* he invoked his rights.

(a) Strickland arrived at the police station and reported that there had been a shooting; he gave the name of the victim, location of the body, and a description of the house in which the body was located and a description of two vehicles that were parked in front of the house. He showed police his State Bar of Georgia card and identified himself as an attorney. This took place, according to the evidence, *before* that invocation of rights.

---

[1] The crime was committed on October 16, 1985. The DeKalb County jury returned its verdict of guilty on June 7, 1988. The motion for new trial was denied on August 17, 1988. The notice of appeal was filed on September 14, 1988. The transcript of evidence was filed on June 14, 1989. The record was docketed in this Court on June 16, 1989. The case was argued on September 14, 1989.

[2] We generally will not review claimed error that has been resolved in an earlier appeal. *Gilstrap v. State,* 256 Ga. 20 (342 SE2d 667) (1986). In this case, however, there was new evidence at the Jackson-Denno hearing regarding the custodial interrogation. The trial court's order states, in pertinent part:

In the second trial, the state again offered these "fruits." To the extent here relevant, the evidence presented in the second trial was essentially the same as the first although there was perhaps a bit more evidence in the second trial as to the police conduct.

The court allowed this evidence over the defendant's objections.

(b) *After* Strickland invoked his rights, the continued questioning produced but minimal information. Specifically, the police learned:

(i) that Strickland had purchased a gun somewhere on Memorial Drive. (The gun was never found.)

(ii) that he had spent the previous night in a motel near the police department.

(iii) that he had driven a Cadillac automobile. (During the second interrogation, Strickland told the police that the Cadillac automobile was parked in the police parking lot.)

(c) At no time, either before or after invoking his privilege, did Strickland ever acknowledge any connection with the *commission* of the crime. Strickland himself testified to the same events as did the manager of the hotel and a sales clerk at the sporting goods store where he purchased the gun.[3]

Any error was harmless beyond a reasonable doubt under the standard of *Chapman v. California*, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967).[4]

3. The question relating to the amount of time Strickland was in custody was raised, addressed, and resolved in his first appeal and we will not reconsider it. *Gilstrap v. State*, 256 Ga. 20 (342 SE2d 667) (1986).

4. (a) Strickland contends that jury instructions on similar transactions, expert testimony, intent, and voluntary manslaughter were erroneous and that the court erred in failing to give other requested instructions.

---

[3] Strickland testified as follows:

And during the lunch on Monday, Vonnie had emphasized to me again the death threats by Brewer's family, and that they were serious, and that I should take them serious. So, I drove from the Applebee's to the Pine Lake Gun Shop and bought the pistol. . . .

Q: You were testifying about when you purchased the gun at the pawn shop. Did you later rent a room at the Aloha Motel?

A: Yes. The gun shop wasn't a pawn shop. It was just a sporting goods type store. I had the room at the motel rented prior to going to Applebee's, I believe.

Q: And why did you rent that room?

A: I was anticipating that after that lunch together, that [my wife and I] would go to that motel and make love.

[4] Note our prior holding in *Wilson v. Zant*, 249 Ga. 373, 378-9 (290 SE2d 442) (1982): We therefore hold that the exclusionary rule does not apply to evidence derived from a voluntary statement obtained in violation of *Edwards v. Arizona* [,451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981)], and that it was not error to admit the "fruits" of the defendant's statement in this case.

Subsequent holdings by the United States Supreme Court, however, raise some question as to whether or not this holding remains valid. See *Nix v. Williams*, 467 U. S. 431, 441 (104 SC 2501, 81 LE2d 377) (1984). Compare *Oregon v. Elstad*, 470 U. S. 298 (105 SC 1285, 84 LE2d 222) (1985).

(b) The following principles govern these contentions:

(i) "It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error." [Cits.] [*Hambrick v. State*, 256 Ga. 688, 690 (353 SE2d 177) (1987).]

(ii) The failure to give a requested instruction is not reversible error where the charge given substantially covers the same principle of law. [*Housel v. State*, 257 Ga. 115, 122 (355 SE2d 651) (1987).]

Viewing the instructions as a whole, we find no error in the enumerations of error concerning jury instructions.

5. (a) Strickland contends that the trial court erred in compelling a psychiatrist to testify, in violation of his psychiatrist-patient privilege and Fifth Amendment rights. The psychiatrist never treated Strickland, and no treatment was contemplated. Strickland called the doctor to the stand to testify as to Strickland's mental state at the time of his wife's death.

(b) In *Massey v. State*, 226 Ga. 703 (177 SE2d 79) (1970), we held:

Before the psychiatrist-patient communications privilege established by [OCGA § 24-9-21 (5)] may be invoked, the requisite relationship of psychiatrist and patient must have existed, to the extent that treatment was given or contemplated. [Id. at 704.]

"[W]e note that a number of courts have allowed the prosecution to offer otherwise inadmissible psychiatric testimony in rebuttal of psychiatric testimony offered in the first instance by the defense." *Ingram v. State*, 253 Ga. 622, 636 (323 SE2d 801) (1984).

There was no error.

6. The trial court did not err in failing to charge the jury *sua sponte* on the issue of insanity. Strickland withdrew his insanity plea during the course of the trial; he did not request an insanity charge; and a charge was not authorized by the evidence.

7. The trial court did not err in allowing the state to impeach its own witness. *Davis v. State*, 249 Ga. 309, 314 (290 SE2d 273) (1982).

8. Strickland claims that the transcript is inaccurate. The trial court heard evidence regarding the accuracy of the transcript, and found that there was no reason to doubt its accuracy "as to anything material." We find no error.

9. The trial court did not err in refusing to admit one of Strickland's exhibits for want of proper authentication. *Suarez v. Suarez*, 257 Ga. 102, 104 (355 SE2d 649) (1987).

10. Strickland contends that the trial court erred in refusing him permission to respond to questions of law not presented except in the state's concluding argument. Strickland referred to "points that were raised concerning motive and the injury being feigned to get drugs that we hadn't any prior knowledge of." The trial court correctly denied Strickland an opportunity to respond to the state's closing argument.

11. The trial court denied Strickland's request to have his co-counsel perform a demonstration with a gun during Strickland's closing argument. This did not amount to a denial of the right to comment upon physical evidence introduced by the state. There was no error.

*Judgment affirmed. All the Justices concur, except Smith, P. J., and Benham, J., who dissent.*

SMITH, Presiding Justice, dissenting.

The appellant never denied shooting his wife; he denied murdering her. He asserted that medication he received at the hospital just prior to the shooting prevented him from being able to form the intent required to be convicted of murder. He also asserted that the crime, at most, was voluntary manslaughter, not murder, because he acted solely as the result of sudden, violent, and irresistible passion resulting from serious provocation. OCGA § 16-5-2 (a). According to his testimony, just moments after they had engaged in an act of sexual intercourse, his wife told him their sexual act had no meaning for her and she began to recite a list of people with whom she had engaged in acts of sexual intercourse.

The state sought a murder conviction, and it used the fruits of the statements it obtained from him through an illegal interrogation to prove an essential element of murder, malice. OCGA § 16-5-1 (b). It cannot be said that the use of the fruits of the illegal interrogation "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U. S. 18, 24 (87 SC 824, 17 LE2d 705) (1967).

The following portion of the *Jackson-Denno* hearing and the trial court's order provide all the facts that are necessary for a thorough understanding of the factual issues in this case.

The following is part of the *Jackson-Denno* hearing:

(Unless otherwise specified the questions are by Mr. Strickland, pro se, and the answers by the detective who interrogated him.)
Q. You would come in and ask me questions and I would respond and sometimes I wouldn't?
A. Right.
Q. But this was contact initiated by you; isn't that correct?

A. I would walk in the room, yes, and ask you a question.
Q. [D]id DeKalb County Police Department have any policies, rules, or procedures concerning the questioning of a person in custody once the person has invoked a right to remain silent and asked for an attorney?

. . .

A. It's up to the individual.
Q. In other words, it's up to the individual officer whether to continue questioning a person who's expressed a desire to remain silent and for an attorney?
A. Well, I have a job to do just like everybody else.
Q. But there was no procedure that once this had occurred, you should not question the suspect further; is that what you're saying?
A. Normally if I don't say that to someone, nobody is going to know it. Right?
THE COURT

. . .

[E]xplain that last answer to me.
A. Okay. If I don't go out there and say to my superior officer, "Mr. Strickland said he wanted an attorney and he's not going to talk anymore to me["] — I think I just stayed in the room. We just kept talking.

The trial court order denying the appellant's motion for new trial follows:

Regardless of how many trials over which one presides, violence remains shocking. In this instance a young lady's life was snuffed out by bullets to the brain. Photographs and other evidence were graphic.

But not even these circumstances justify illegal police conduct such as that which occurred in this case. At approximately 10:00 A. M., October 16, 1985, several hours after he had pumped three bullets into the head of his wife, the defendant, an attorney, walked into the police station and announced that he was there to talk about "the shooting." Mistakenly, he assumed the police had received notice of this incident.

The defendant was placed under arrest at approximately 11:00 A. M. After he was advised of his constitutional rights, he elected to remain silent until he had an opportunity to talk with a lawyer.

This notwithstanding, for a period in excess of nine hours after he had invoked his right to remain silent, the po-

lice continued to conduct interrogation of the defendant. During this time, the defendant had nothing to eat.

The state agrees that the police conduct occurred, and that it was illegal. Except for the excuse offered by the police detective, "Well, I have a job to do just like everybody else," no effort was made to justify this conduct; no explanation was offered.

After Jackson-Denno hearings, the court allowed into evidence certain statements made by the defendant prior to 11:00 A. M. but, at the first trial, did not allow into evidence statements made after that time. In the second trial the state, correctly anticipating the court would have excluded statements made after 11:00 A. M., did not offer them. But the statements were not all which was obtained from the defendant during this interrogation.

In the first trial, over the defendant's objections, the court allowed into evidence certain testimony and physical evidence developed as a result of the illegal interrogation. Collectively these may be referred to as the "fruits" of the interrogation.

On appeal the defendant urged that this ruling was erroneous. After reversing the case on another ground, the Supreme Court stated: "In light of the possibility that this case may be retried, we have reviewed the defendant's remaining enumerations and have found no error which would require reversal." This language has special meaning when one evaluates rulings in the second trial.

In the second trial, the state again offered these "fruits." To the extent here relevant, the evidence presented in the second trial was essentially the same as the first although there was perhaps a bit more evidence in the second trial as to the police conduct.

Again, the court allowed this evidence over the defendant's objections.

In his motion for new trial, the defendant again alleges that this ruling, among others, constitutes error justifying or requiring a new trial.

Attached to this order is a copy of one page of the transcript of the Jackson-Denno hearing in the second trial. At best it reveals a casual attitude of one police detective as he acknowledged the conscious illegal violation of individual rights. At worst, it suggests a disturbing police department policy which could be stated as : "We will look the other way while you do what you want to." Neither approach, and nothing in between should be tolerated.

The question then becomes: what is an appropriate sanction? Except for the suppression of evidence in appropriate instances few remedies are available to the court. The defendant urges that suppression is the only effective method of controlling illegal police conduct.

The law does not require automatic exclusion of the "fruits" of an illegal interrogation. Considering all of the facts and circumstances of this case, including the fact that in the first appeal the Supreme Court has already considered the issues and determined that these trial rulings, even if erroneous, did not require a new trial, this court has concluded that suppression of this evidence would not be appropriate.

Further review by the Supreme Court is anticipated and welcomed.

As noted above, the defendant's motion for new trial is denied on all grounds.

The statements made by the appellant that were suppressed included information about: the location of the appellant's automobile, the location of a motel where the appellant spent the night, the location of a gun shop where the appellant purchased a gun. The fruits that were allowed included: some live and some spent bullets found in his automobile; a registration slip showing that the appellant registered at a motel near the place the victim was staying on the night before the shooting, a box of bullets found in the motel room, and the testimony of the motel clerk; a registration slip showing that the appellant purchased a gun the day before the shooting and the testimony of the clerk who sold the appellant the gun and the box of bullets. The fruits from the motel and gun shop were used to prove that the appellant planned the day before the shooting to murder his wife.[1]

The state concedes that the statements made by the appellant after he invoked his rights "were obtained in violation of the proscriptions of *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966) and *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). . . ." It is agreed that the statements must not be allowed. *Allen v. State*, 259 Ga. 63, 66 (377 SE2d 150) (1989) and *United States v. Suggs*, 755 F2d 1538, 1541 (11th Cir. 1985). The disagreement involves whether or not the fruits of the statements should be allowed.

---

[1] The majority finds that the admissions of the fruits was not erroneous because the appellant's testimony was not inconsistent with that of the clerks. However, the appellant strenuously argues that the use of the illegal evidence compelled him to testify. See *Harrison v. United States*, 392 U. S. 219 (88 SC 2008, 20 LE2d 1047) (1968).

Since *Watts v. Indiana*, 338 U. S. 49 (69 SC 1347, 93 LE 1801) (1949), the United States Supreme Court has used the Due Process Clause to reverse convictions that were obtained by police procedures that violated the basic notions of our accusatorial mode of prosecuting crime.

> Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. [Cit.] Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. . . . Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police *for the purpose of eliciting disclosures* or confessions is subversive of the accusatorial system. It is the inquisitorial system.
>
> . . .
>
> In holding that *the Due Process Clause bars police procedure which violates the basic notions of our accusatorial mode of prosecuting crime and vitiates a conviction based on the fruits of such procedure*, we apply the Due Process Clause to its historic function of assuring appropriate procedure before liberty is curtailed or life is taken. . . . (Emphasis supplied.)

Id. at 54, 55. See also *Rogers v. Richmond*, 365 U. S. 534, 541 (81 SC 735, 5 LE2d 760) (1961). (Subjecting a defendant to pressures that violate our accusatorial system offends that due process of law which the Fourteenth Amendment guarantees.)

Later cases such as *Miranda* and *Edwards* were necessary to provide a modern definition of the conduct that "violates the basic notions of our accusatorial mode of prosecuting crime[,]" *Watts*, supra, 338 U. S. at 55, so that courts could determine when the government used methods offensive to the accusatorial system by engaging in an inquisitorial system. Those cases gave new meaning to the balance that must be maintained between the state and individual and defined modern pressures that are not allowed. The balance was discussed in *Miranda* as follows:

> [T]he constitutional foundation underlying the privilege is the respect a government — state or federal — must accord

> to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," [cit.], to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. [Cit.]. In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." [Cit.]

*Miranda,* supra, 384 U. S. at 460. *Miranda* discussed the pressure of the modern methods of interrogation and concluded that "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . ." Id. at 474. *Miranda* teaches us that continued questioning after an invocation of the right to remain silent offends our accusatorial system.

Later *Edwards* reconfirmed that "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights. . . ." *Edwards,* supra, 451 U. S. at 485. *Edwards* declared that once an accused makes a request for counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85. *Edwards* teaches us that continued questioning after an invocation of the right to counsel offends our accusatorial system. Those police procedures that violate "the basic notions of our accusatorial mode of prosecuting crime[,]" *Watts,* supra, 338 U. S. at 55, as defined by *Miranda* and *Edwards,* violate due process.

If there is a violation of our accusatorial system there is a due process violation. Due process is equally offended by the conviction of a defendant based upon the fruits of his statements as a conviction based upon the statements themselves. As *Edwards* stated: "[T]he fruits of the interrogation initiated by the police . . . could not be used against Edwards." *Edwards,* supra, 451 U. S. at 485.

> The doctrine requiring courts to suppress evidence as the tainted "fruit" of unlawful governmental conduct had its genesis in *Silverthorne Lumber Co. v. United States,* 251 U. S. 385 (1920); there, the Court held that the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence. . . .
>
> . . .

Wong Sun v. United States, 371 U. S. 471 (1963), extended the exclusionary rule to evidence that was the indirect product or "fruit" of unlawful police conduct. . . .

Nix v. Williams, 467 U. S. 431, 441 (104 SC 2501, 81 LE2d 377) (1984).

The fruits of the illegal police interrogation were not obtained "through skillful investigation. . . ." Watts, supra, 338 U. S. at 54. The state did not use evidence obtained "by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." Miranda, supra, 384 U. S. at 460. The evidence was not obtained as the result of independent police work. The evidence was obtained by continued questioning after the appellant clearly invoked his rights. The interrogation was a deliberate violation of the appellant's rights for the sole "purpose of eliciting disclosures," Watts, supra, 338 U. S. at 55, and the Due Process Clause should be used to bar the police procedure that violated the "basic notions of our accusatorial mode of prosecuting crime. . . ." Id.

Alternatively, the exclusionary rule should be used to deter the illegal and bad faith police conduct that violated the appellant's Fifth Amendment right to counsel.

The exclusionary rule is the method by which police illegality is deterred.

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

Nix v. Williams, supra, 467 U. S. at 442. Here, the illegal efforts of the police have been rewarded rather than deterred — the state was able to use the fruits of the appellant's excluded statements to obtain a murder conviction. The prosecution was put in a better position than it would have been without the illegal custodial interrogation.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED MARCH 9, 1990 —
RECONSIDERATION DENIED MARCH 28, 1990.

*William T. Hankins III, Carl P. Greenberg,* for appellant.

*Robert E. Wilson, District Attorney, Barbara B. Conroy, Assistant District Attorney, Michael J. Bowers, Attorney General,* for appellee.