United States Court of Appeals,

Eleventh Circuit.

No. 94-9147.

Robert STRICKLAND, Jr., Petitioner-Appellant,

v.

Leland LINAHAN, Warden, Respondent-Appellee.

Jan. 22, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:91-CV-428-JOF), J. Owen Forrester, Judge.

Before HATCHETT and BIRCH, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

This is a habeas corpus case, brought by a Georgia state prisoner convicted of the malice murder of his wife. His first conviction was reversed[1] and, after retrial, a second conviction was affirmed.[2] State habeas corpus was denied by the trial court and application for a certificate of probable cause denied by the Supreme Court of Georgia. The United States District Court adopted reports and recommendations of a magistrate judge, entered after evidentiary hearings, and denied the writ. We affirm.

It is not disputed that Strickland shot and killed his wife on October 16, 1985. The issues on appeal center around his defense that he lacked the ability to form an intent to kill because he was suffering from a reaction to drugs given him for pain from an injured shoulder.

---

[1] *Strickland v. State,* 257 Ga. 230, 357 S.E.2d 85 (1987).

[2] *Strickland v. State,* 260 Ga. 28, 389 S.E.2d 230 (1990).

## I. The chronology

Strickland and his wife separated in July 1985 pursuant to a separation agreement.  According to Strickland, in August 1985 she told Strickland that she was pregnant and did not know who the father was.  He paid for her to have an abortion.  At times they spent nights with each other at their separate residences, and she continued to have sexual relations with him, though she was also having relations with a boyfriend.

On the night of October 12, Strickland, carrying a cocked pistol, broke into his wife's home and, according to him, found her in bed with her naked boyfriend.  According to the boyfriend, he was in the apartment, not unclothed, and Mrs. Strickland was in another room.  Strickland shot the boyfriend in the abdomen, then scuffled with him and shot him four more times, though not fatally.  Strickland's shoulder was dislocated.  He was arrested, the gun seized, and he was released on bond.

On October 13 Strickland wrote several letters to family members and a friend, implying suicide.  In a letter to his wife's parents he implied that he intended to kill his wife and commit suicide.  The letters were sealed in separate envelopes, one addressed to a friend, another to his wife's parents, others to family members.  He left them at his mother's house.

In trial testimony Strickland related that on October 13 he heard that the boyfriend's family was threatening to kill him.  And, on October 14, he and his wife had lunch together and made plans to go to a football game.  The next day, October 15, Strickland deposited $3,000 in his wife's checking account.  That

same day he bought a pistol because of, according to him, threats from the boyfriend's family.

Around 5:30 a.m. on October 16, Strickland went to the emergency room of a hospital because of pain from his shoulder that he asserts he had again dislocated. He was given valium and demerol and his shoulder was reset. Around 8:30 a.m. he drove to the home of his wife's female friend, where she had gone after the incident with the boyfriend. Events that occurred there are set out in Strickland's own testimony. They talked. She had intercourse with him. She told him of several adulteries, including one incident with another woman. She named several sexual partners. She told him that the sex act no longer had any meaning for her. He then shot her from close range, one shot to the back of the head from several feet away, one more to each side of the head from point blank range.

Strickland drove to the police station at 10:30 a.m., a 20-minute drive. He identified himself as an attorney and a member of the Georgia bar. He told an officer that he was there about "the shooting." Police had no information about a shooting and initially thought Strickland himself had been shot because his arm was in a sling. Strickland told an officer the address where the shooting had occurred and described the house and an automobile parked nearby. Without objection Strickland rode with officers in a police car to the address given. Strickland's recital of facts, corroborated by the description of the house and the parked automobile, and other details, focused suspicion upon him. An officer entered the house and found the victim's body. Beside it

was a jacket that turned out to be Strickland's, and in the pocket were .38 caliber bullets.  The gun itself was never found. *Miranda* warnings were given to Strickland.

In the victim's suitcase, in the house, police found a copy of the separation agreement between the Stricklands and a second document, dated October 12 and signed by Strickland, stating that in consideration of one final act of intercourse he would file for an uncontested divorce on no fault grounds.  The medical examiner retrieved three .38 caliber bullets from the wife's body.

On return to the police station Strickland said that he did not want to make any further statement without talking to an attorney, but officers continued to question him over a period of hours.  Strickland gave information about three matters:  the location of a motel where he had spent the preceding night, the location of a gun shop where he had bought the gun on October 15, and the fact that he had parked his car in the police parking lot. These statements led to derivative evidence.  The motel clerk testified to Strickland's registration.  Search of his motel room produced a box of .38 caliber bullets and a registration slip showing purchase of a gun on the day before the shooting.  A clerk from the gun shop where Strickland had bought a gun on October 15 was subpoenaed.  He described the purchase and identified a form that Strickland filled out and signed when he bought the gun. Police searched Strickland's car in the police parking lot and found in it both live and spent .38 caliber bullets.

After Strickland went to police and told them of his wife's death, he called his daughter, Caren, and told her to get the

letters he had written on October 12 and hold them for him. She took possession of the letters, opened and read them, showed them to her sisters, revealed at least some of them to another family member, and took them to her home in North Carolina.

## II. Admission of the letters

During the second trial the prosecutor learned of the letters from a member of Strickland's family. He called Caren in North Carolina, and she read at least one of the letters to him. He then either asked (according to his testimony) or directed (according to her testimony) that she bring the letters to the site of the state trial in Georgia, and she did so. She was paid travel expenses.

Strickland contends that use of the letters violated his rights under the Fourth and Fifth Amendments. The federal district judge found that the Fourth Amendment issue was not precluded by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). He considered the issue on its merits and rejected Strickland's contentions.

Pretermitting whether Strickland had an expectation of privacy in the letters, they were voluntarily published by Caren. She revealed their contents to family members and voluntarily published to the prosecutor at least one of the letters by reading it to him over the telephone. Her actions to this point were indisputably private, not in any sense state action. Caren testified that the prosecutor threatened that the letters would be seized and she would be arrested if she did not bring them to the trial site in Georgia. He denied threatening her, the court found his testimony credible and hers not credible, and concluded that she had

voluntarily brought the letters to the trial. These findings are not plainly erroneous. There was no state seizure and thus no Fourth Amendment violation.

Assuming the Fifth Amendment applied to use of the letters, there was no violation since, based on the findings by the district court, they were not seized and production of them was not coerced.

### III. Cross-examination of the psychiatrist

At his first trial Strickland relied on an insanity defense. By court order he had been examined by Dr. Boaz Harris, a psychiatrist, who had interviewed him on January 23, 1986, some three months after the shooting, for about two hours. Dr. Harris testified at the first trial that, in his opinion, when Strickland shot his wife he was unable to distinguish right from wrong and unable to form an intent to kill his wife. He based his opinion on the hospital records showing the drugs that Strickland had been given and on the description Strickland had given in his interview of the events when he shot his wife and of his intent and state of mind at that time.

Before the retrial Dr. Harris interviewed Strickland twice more for a total of about four hours. Strickland was not given *Miranda* warnings for any of his interviews.

During the retrial, before Dr. Harris testified, Strickland withdrew his insanity defense and stood on a contention that he was incapable of forming an intent to kill. Dr. Harris was asked his opinion whether, around 8:30 a.m. on October 16, Strickland could have formed the intent to kill his wife. He responded with the opinion that, because of the side effects of the valium and demerol

administered as indicated on Strickland's hospital records, his ability to think in a logical, rational manner was so impaired that he could not in a rational manner have formed the intent to kill his wife. He discussed automatism—i.e., a person's functioning automatically without knowing what he is doing—and, considering the drugs administered as shown by the hospital records, stated that it was "quite possible" that Strickland's act of shooting his wife was such an automatic reaction. Dr. Harris based his opinions given at the retrial upon the hospital records, his knowledge and experience relating to the particular drugs, and an authoritative publication, the *Physician's Desk Reference.*

When direct examination was concluded the prosecution sought to inquire into statements made by Strickland to Dr. Harris during the interviews. The defense objected on Fifth Amendment grounds. On examination by the court Dr. Harris restated his position that his opinion was not based on anything learned from his interviews with Strickland.

A host of questions remained when direct examination of Dr. Harris was concluded. Was Dr. Harris's opinion reliable? Did he in fact rely upon only the hospital records, his experience, and the *Physician's Desk Reference?* Were these bases alone an acceptable basis for a psychiatrist's opinion of the defendant's state of mind when he had heard from the defendant himself statements describing his state of mind at the relevant time and place, i.e., was it an acceptable methodology for forming an opinion to limit the basis for an opinion as Dr. Harris did? Was other information available that should have been considered before

an opinion was rendered based on only the truncated predicate that Dr. Harris described?  Did Dr. Harris know whether before the drugs were administered Strickland entertained an intent to kill his wife, and did he seek that information?  Was it necessary to consider the shooting of the boyfriend as evidence of a willingness or propensity by Strickland to engage in violence when faced with knowledge of his wife's misconduct and, if it was, could the expert properly accept as correct Strickland's version of what occurred and reject the boyfriend's very different version?

The Fifth Amendment problem presented by this case was foreshadowed in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).  Smith did not plead insanity nor did he introduce psychiatric evidence, but the state offered evidence obtained from a court-ordered competency examination as affirmative evidence to support the sentence of death at the sentencing phase of a capital murder case.  The Court held that this violated his Fifth Amendment rights.  It distinguished its decision from other situations:

> Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense.  When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case.  Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.  See, *e.g., United States v. Cohen,* 530 F.2d 43, 47-48 (CA5), cert. denied, 429 U.S. 855 [97 S.Ct. 149, 50 L.Ed.2d 130] (1976); *Karstetter v. Cardwell,* 526 F.2d 1144, 1145 (CA9 1975); *United States v. Bohle,* 445 F.2d 54, 66-67 (CA7 1971); *United States v. Weiser,* 428 F.2d 932, 936 (CA2 1969), cert. denied, 402 U.S. 949 [91 S.Ct. 1606, 29 L.Ed.2d 119] (1971); *United States v. Albright,* 388 F.2d 719, 724-25 (CA4 1968); *Pope v. United States,* 372 F.2d 710, 720-21 (CA8 1967) (en banc),

vacated and remanded on other grounds, 392 U.S. 651 [88 S.Ct. 2145, 20 L.Ed.2d 1317] (1968).[10]

> [10] On the same theory, the Court of Appeals here carefully left open "the possibility that a defendant who wishes to use psychiatric evidence in his own behalf [on the issue of future dangerousness] can be precluded from using it unless he is [also] willing to be examined by a psychiatrist nominated by the state." 602 F.2d at 705.

*Id.* at 465-66, 101 S.Ct. at 1874.

In *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Court found there was no Fifth Amendment violation by use of a psychiatrist's report because "petitioner's entire defense strategy was to establish the "mental status' defense of extreme emotional disturbance" and his counsel had joined in a motion for his examination. *Id.* at 423, 107 S.Ct. at 2918. The Court found the case to be one of the situations distinguished from the facts of *Smith.* "[W]ith petitioner not taking the stand, the Commonwealth could not respond to this defense [extreme emotional disturbance, based on psychiatric reports] unless it presented other psychological evidence." *Id.* The psychologist's testimony consisted of his general observations and did not concern the crime itself. This particular application of the distinction pointed out in *Smith* does not limit the principle itself. Indeed *Buchanan* restates the *Smith* principle:

> [I]f a defendant requests such [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* at 422-23, 107 S.Ct. at 2917-18.

Subsequent cases read the *Smith/Buchanan* principle in terms of waiver.

Language contained in *Smith* and in our later decision in *Buchanan v. Kentucky,* 483 U.S. 402 [101 S.Ct. 1866, 68 L.Ed.2d 359] (1987), provides some support for the Fifth Circuit's discussion of waiver [in *Battie v. Estelle,* 655 F.2d 692 (1981) ]. In *Smith* we observed that "[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case." 451 U.S., at 465, 101 S.Ct., at 1874. And in *Buchanan* the Court held that if a defendant requests a psychiatric examination in order to prove a mental-status defense, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through that examination to rebut the defense. 483 U.S., at 422-423, 107 S.Ct., at 2917-18.

*Powell v. Texas,* 492 U.S. 680, 684, 109 S.Ct. 3146, 3149-50, 106 L.Ed.2d 551 (1989). See also, *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.1978) (no Fifth Amendment violation by admitting psychiatric testimony when the defendant admitted that he did the act and argued only that he lacked the specific intent required by the act), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

Dr. Harris' opinion presented by Strickland was said to be based upon the hospital records, his experience, and the *Physician's Desk Reference* manual, and not to any extent on factual data that came from Strickland himself. But the doctor's opinion rested in part upon factual predicates the only source of which was Strickland. Time of death was relevant because it bore on whether the effect of the drugs that had been administered at a known time continued to the time the wife was shot. Dr. Harris' opinion assumed that Strickland killed his wife about 8:30 a.m. But Strickland, the only eye witness, was the sole source of that information; his activities from around 5:30 a.m. to around 10:00

a.m. are not known except from Strickland's own testimony.[3] The doctor's opinion also embraced the effects of fatigue, exhaustion, and loss of sleep, additional information that could have come only from Strickland. Also, Dr. Harris discussed the effect that having a personality that concealed one's feelings would have on capacity to form intent. This was an issue Strickland drew into the case, and the details of his personality came from interviews.

We hold that Strickland had waived any Fifth Amendment objections to Dr. Harris' testimony. Dr. Harris' subsequent testimony on cross-examination bore directly on intent. He testified that Strickland related to him going to the house and specifically spelled out what had occurred there between him and his wife. He testified that Strickland had been able to relate his conversations at the scene with his wife and to describe his own physical sensations. Strickland recalled specific names of lovers mentioned by the wife. Strickland recalled that he had a firearm in his jacket, that he pulled it out, and that he pointed it at his wife's head. He recalled firing the first shot. Despite Dr. Harris' opinion that Strickland could not think in a rational way, he accepted that Strickland knew where he was, knew that a gun would fire a shot, and knew that if a gun were placed against someone's head it was likely to cause immediate death.

As the cross-examination developed it revealed that reliance

_____

[3]The time of 8:30 a.m. was set by Strickland himself, acting as his own attorney, in framing his direct examination of Dr. Harris. In similar fashion, in pursuing the effect of the drugs, he established his own age and weight. This is not to suggest that this was inappropriate. The point is that there were factual underpinnings for the doctor's opinion that came from Strickland and not from hospital records.

upon only the hospital records was not as firm or as reliable a basis as the direct examination had indicated. It revealed that Dr. Harris had not pursued other available sources of information and that had he had knowledge of preexisting intent his opinion would have changed. Though Dr. Harris stood on his testimony that he had relied on only the hospital records and had not relied on what Strickland had related to him, elsewhere he indicated that records alone, without an interview, would not be a sufficient basis for an opinion.

> Q [Is your opinion] based on your clinical experience of the drugs and your reviews of the drugs that he received, and not on your conversation with him?

> A It is based on that. I would not have ever had to examine Mr. Strickland to give you an opinion that that much medication in an individual who's not accustomed to using large amounts of drugs or Valium would greatly interfere with his cortical functioning.

> Q Okay. Could you have—and could you have come into this court without ever having seen Robert Strickland and simply reviewed the medical records and testify to what you're testifying to today on Direct Examination?

> A *I could testify on that basis, but I would not, in that he was available to me.*

> Q But it would be theoretically possible?

> A It would be theoretically possible, yes, sir.

> Q And you would in fact be comfortable doing that?

> A Oh, yes, sir.

Tr. 1106-07. Second, as we discuss in Part IV, there was substantial evidence that Strickland's intent to kill predated the administration of the drugs. Dr. Harris acknowledged that if he had known of a preexisting intent to kill his opinion would have changed.

Q What if he had pre-existing intent before taking the drug, sir? What if he, before he went to DeKalb General Hospital that morning, intended to kill his wife that day? Would that change your opinion?

A If I knew him to have pre-existing intent?

Q Yes, sir. If you knew that he intended to kill his wife when he got up that morning before he ever went to DeKalb General, before he ever took any Demerol, before he ever took any Valium, would that change your opinion?

A It would change my opinion.

Tr. 1113-14. In his testimony, after Dr. Harris testified, Strickland acknowledged that after the incident with the boyfriend he had "thought about" killing himself and his wife.

With respect to the shooting of the boyfriend and its possible relevance, Dr. Harris accepted Strickland's representations (except for his contention that the first shot was accidental) and rejected the boyfriend's version of the incident, which was sharply different from Strickland's. He did so without talking with the boyfriend. Though Strickland shot the boyfriend five times Dr. Harris gave as his opinion that he did not intend to kill.

The first person with whom Strickland talked after the shooting was a police officer at the station. Dr. Harris did not talk to him. The last persons known to talk with Strickland before the shooting were the doctor who prescribed the medication he received and the nurse who administered it. Dr. Harris talked with neither of them.

Moreover, the breadth to which Dr. Harris' opinions swept was relevant in assaying the reliability of his specific opinion concerning Strickland's capacity to form an intent to kill. There was no evidence of when and where Strickland emptied the spent

shells from the gun, or when and where he disposed of the gun, or that he told Dr. Harris about either of those events. But Dr. Harris gave as his opinion that when Strickland emptied the gun he was not in good contact with reality but rather was performing an automatic act, and that disposing of the gun was neither automatic nor intentional and that Strickland merely lost it or mislaid it. And, as we have already pointed out, he expressed an opinion that Strickland did not intend to kill the boyfriend in the affray that took place three days before he was administered the drugs.

The trial court did not err in permitting the testimony of Dr. Harris to be tested by cross-examination.

### IV. Use of statements to police

The state conceded in state court proceedings that the statements made by Strickland to police after his invocation of the right to an attorney were improperly elicited. The statements themselves were excluded in the second trial, but the derivative evidence was admitted. Strickland contends that the derivative evidence was inadmissible and that the state's use of it impelled him to testify, which otherwise he would not have done.

We agree with the Georgia Supreme Court and the district court that the use of the derivative evidence drawn from Strickland's in-custody statements was harmless beyond reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[4] There was no question that Strickland had committed the

---

[4]In an alternative ground of decision the district court found, pursuant to *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), that the police conduct did not infringe the defendant's right against self-incrimination but violated only the prophylactic rules of *Miranda.* We pretermit

killing and when and where he had done it and the use of a gun. Strickland had driven to the police station and reported the killing.  The information he gave implied that he had full knowledge of it or somehow was involved.  Strickland voluntarily went with police to the house where his wife's body lay to investigate the report.  His jacket was found beside her body, with bullets in the pocket that matched those in her head.  The discovery of bullets in Strickland's car and in the motel room was merely corroborative;  they matched those found in his jacket beside the body and those found in the body itself.  The details of purchase of the gun were not central.  Strickland does not dispute that he took a gun to the crime scene, loaded and concealed in his jacket, and took it out and fired it.  In the overall picture, when and how he came into actual possession of it after his first gun was seized is of modest significance.[5]

The evidence of marital discord, of flagrant misconduct by the wife, of willingness of Strickland to commit violence because of that misconduct, of Strickland's intent to kill his wife as recorded in the letters, his possession of a second gun,—all of this predated the administration of the drugs.  The pattern of shots fired into the wife's body was itself evidence of intent;  an

discussion of this issue because of our finding pursuant to *Chapman v. California.*

[5]The district court did not rely on inevitable discovery of the derivative evidence but it might well have done so. Strickland left his car in the police lot, where it would have been found.  It is not clear whether Strickland was given *Miranda* warning before or after police, at the house, asked him where in the house the body was, but it matters little since police were there to go into the house pursuant to his report to them and search for a victim and would have done so.

expert testified that the pattern of firing evidenced a methodical killing.

We have discussed in Part III the evidence of intent revealed by the testimony of the psychiatrist.

Application of the *Chapman* principle is mandated in this case.

## V. Other issues

Strickland contends that the evidence of intent was insufficient to meet standards of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and that the jury instruction on manslaughter unconstitutionally shifted the burden of proof. These are without merit and require no discussion. Even if the warrantless search of the motel room was illegal the issue might have been raised in state court, and, in any event, the evidence found (.38 cartridges and the slip showing purchase of the gun) was merely corroborative.

AFFIRMED.